UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESS BAHS AND DENISE BAHS,

    Plaintiffs,

-vs-

JOHN DOE DEFENDANT(S) (1) – (3),

    Defendants.

Civil Action:
Hon.

_____

**COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

Plaintiffs Jess Bahs and Denise Bahs (collectively, "Plaintiffs"), by their undersigned attorneys, and for their complaint against Defendants John Doe 1, John Doe 2, and John Doe 3 (the as-yet identified John Doe Defendants are one or more persons or entities, currently unknown to Plaintiffs, who engaged in or aided the manipulation of certain securities known as Exchange Traded Funds ("ETFs"), which were traded by Plaintiffs) submit the following:

**I.      SUMMARY OF CLAIMS**

1. Plaintiffs bring this action against Defendant(s) for engaging in unlawful market manipulation in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated by the Securities and Exchange

1

Commission (SEC), in addition to Section 9(a)(2) of the Securities Exchange Act of 1934, and state law fraud.

2. Upon information and belief, Defendant(s) are among a pool of securities market makers that trade with customers across the country, including customers in Michigan.

3. Statistical analyses of trading patterns, price fluctuations, and volume spike anomalies strongly demonstrate the presence of manipulative conduct that artificially influenced the price of various ETFs purchased and sold by Plaintiffs.

4. While the specific parties involved are not directly observable without reviewing trade records that are not publicly available, statistical irregularities involving both price and volume movements demonstrate that Defendant(s) engaged in manipulative actions such as what are commonly referred to as spoofing, layering, wash trading, painting the tape, and/or other deceptive practices that distorted the market price of the security.

5. More than ten different ETFs are at issue for purchases and sales occurring during the years 2021 and 2022 (the "Relevant Period").

6. Throughout the Relevant Period, Defendant(s) deliberately engaged in manipulative conduct that interfered with the natural forces of supply and demand, and repeatedly drove ETF prices downward immediately after purchases by Plaintiffs, and also upward immediately after Plaintiffs subsequently made sales.

4902-4767-3669, v. 1

Specifically, after Plaintiffs would buy an ETF, the Defendant(s) would manipulate the price downward below what the price would be in the absence of any manipulation (the "Natural Market Price"). Statistical analyses show that shortly after Plaintiffs later sold that ETF, it typically would rise and return to or near the Natural Market Price – thus resulting in losses to Plaintiffs. Conversely, around the same time, the Defendant(s) would sell short (or the equivalent) the same ETF securities at the higher initial Natural Market Price, thus leading to a gain for the Defendant(s) on their short position following their manipulation of the ETF price to an artificially low level.

7. Defendant(s)' manipulation violates Section 10(b), Rule 10b-5, and Section 9(a)(2) of the Securities Exchange Act of 1934, and constitutes fraud under state law.

8. Plaintiffs are Michigan residents residing and working within the Eastern District of Michigan.

9. Spoofing is a form of market manipulation that is accomplished by placing baiting orders in the order book system that are not intended to be executed and have no legitimate economic purpose. The purpose of these baiting orders is to create a false illusion of market interest (either positive or negative) that will generate a response from other market participants that the spoofers can use to their advantage. Shortly after placing baiting orders, the spoofer then often cancels the

3

baiting orders before the orders can be filled, which completes the profitable spoofing cycle. The spoofer never has the intent to have an order filled. The spoofer wants the briefly visible order to move the bid and ask prices, which makes it appear to others that buyers or sellers are lining up with the intent to buy or sell when none actually exist. The baiting orders create an order imbalance between the buy and sell side of trading. If more sell orders are placed than buy orders (even though the sell orders end up being cancelled), it appears that there is more selling interest on the exchange, which pushes prices down. The illusion of market interest perceived by other traders causes these other traders to act since they believe the price will move as a result of the sell-side baiting orders. By deceiving others into making trades that further push the price in the direction intended by the spoofer, share trading volume also increases. This is the effect the spoofer wants without actually having to place trades and use the spoofer's money to move the price. The spoofer placed its actual trade well before the spoofing order process ever started, which allows the spoofer to then profit from the price move that was caused by the cancelled orders.

10. Layering is a form of spoofing that involves opened and cancelled orders that are placed at different levels above or below the traded price at a given point in time (hence referred to as layered or layering). With layering, the orders generally are not cancelled as quickly, but still have the same deceiving effects on market participants.

4902-4767-3669, v. 1

11. Spoofers typically utilize algorithmic trading programs through high-frequency trading computer systems which enable many baiting orders to be placed in a matter of seconds. Other algorithmic trading programs notice the baiting orders and take the bait, although often not for the reason expected.  It is not because other algorithmic trading programs are fooled - it is because they know the baiting process will work and the computer program is designed to trade early in the process of the resulting price move caused by the spoofer's baiting orders.  A herd mentality results from the spoofer's initial actions. The herd mentality is reflected in the volume spike and price move.  As a result of the algorithmic trading programs used by large market participants, these participants are more often trading with each other instead of against each other the way they would in a fair market environment.  Technology often allows the spoofer's tactics to work in its favor more than against it.

12. Statistical analysis of the evidence, including price change anomalies and volume spike anomalies, demonstrates that Defendant(s) (whether directly or through their agents) engaged in spoofing and other illegal practices to manipulate the price of the ETFs traded by Plaintiffs during the Relevant Period.

13. Statistical tests of price fluctuations following Plaintiffs' purchases and sales during the Relevant Period show significant statistical anomalies. The statistical methods included T-Tests and Z-Tests, which are standard industry methods used for testing hypotheses and detecting statistical anomalies. In this case,

the T-Test measures the probability of whether the price fluctuations and volume movements were due to natural market events or instead market manipulation. T-Tests were performed using equal variance and unequal variance assumptions.

14. A Z-Test is similar in that it is used to determine if there is a statistically significant difference in values between two populations. This test is particularly useful when the population's standard deviation is known and the sample size is large (typically 30 or more). Here, the Z-Test is capable of determining how random or extraordinary a price move is compared with the overall price moves observable in the market. In this case, the sample is in the range of hundreds making the price fluctuations at issue well suited to a Z-Test analysis.

15. For the traded ETFs at issue, the probability of the price movements being due to price manipulation is in excess of 95%, which is considered the statistically significant level among statistic experts (stated differently, there is a less than 5% probability that fluctuations were due to natural market events).

16. Volume for the relevant ETFs also mysteriously spiked more than 20% on average on the days involving trades by Plaintiffs. Many of the T-Tests conducted to analyze these volume spikes also show a less than 5% probability that the volume spikes were due to natural market events. Volume spikes are commonly known to be associated with spoofing and layering manipulative tactics.

4902-4767-3669, v. 1

17. Based on the above-described volume spikes and T-Test and Z-Test statistic results, price movements cannot be explained without unlawful intervening factors within the control of the Defendant(s) and their agents.

18. By repeatedly manipulating the market after Plaintiffs made their trades, Defendant(s) intentionally and directly impacted the price of ETF shares in the market causing Plaintiffs significant losses as Plaintiffs sold shares of the ETFs at artificially depressed prices after buying the shares before manipulative events reduced the share price for the position held by the Plaintiffs.

## II.     **JURISDICTION AND VENUE**

19. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 (pendent jurisdiction) because those claims are so related to the federal claim that they form part of the same case or controversy.

20. This Court has personal jurisdiction over the Defendant(s). Upon information and belief, Defendant(s) directed their fraudulent activity into this market by manipulating prices of the relevant ETFs over electronic markets used by Plaintiffs and other parties across the United States. The unlawful acts committed by Defendant(s) had a direct and substantial impact on the market prices for the relevant ETFs traded in all of the United States.

21. This Court also has general personal jurisdiction over the Defendant(s) because the Defendant(s), upon information and belief, have maintained systematic and continuous contact with the State of Michigan in the course of their business operations. Defendant(s) have also availed themselves of doing business in the State of Michigan by directing their activities to customers in the State of Michigan.

22. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391 in that Defendant(s) directly or indirectly made use of the means or instrumentalities of interstate commerce including the mails in connection with the conduct alleged herein, including conduct directed to parties located in Michigan and in this District.

### III. THE PARTIES

#### A. Plaintiffs

23. Plaintiffs reside in Michigan, and they purchased the ETFs at issue and suffered financial losses due to Defendant(s)' market manipulation.

#### B. Defendant(s)

24. The John Doe Defendants represent one or more persons or entities, currently unknown to Plaintiffs, who engaged in or aided the manipulation of prices for the relevant ETFs.

4902-4767-3669, v. 1

25. Plaintiffs' statistical evidence shows that non-anonymized trading records obtainable by subpoena will allow Plaintiffs to unmask one or more Defendants to be named in a future amended version of this civil complaint.

IV. **DEFENDANT(S)' FRAUD AND MANIPULATION**

26. During the Relevant Period, the market prices of the ETFs at issue exhibited statistical anomalies inconsistent with normal market behavior.

27. Trading volume surged without corresponding fundamental news or events, indicating artificial market activity.

28. Price movements, combined with unusual trading volume increases, followed irregular cycles suggestive of spoofing or other market manipulative actions, where artificial buy/sell orders created misleading supply and demand signals to artificially and illegally move the market price of a security either upwards or downwards.

29. Statistical evidence suggests these irregularities correlate with Defendant(s)' trading activities, which disproportionately influenced stock price fluctuations.

30. It is believed that the Defendant(s) to be unmasked likely utilized high-frequency trading computer systems that operate algorithmic trading programs to maximize the speed of their market access and the execution of their trading strategies, creating a false illusion of excess supply or demand. Baiting orders were

entered to create an illusion of market interest intended to generate a response from other market participants to follow the artificial selling or buying trend that baiting orders created.

31. Defendant(s)' manipulative conduct occurred on days when Plaintiffs made trades in the ETFs at issue and during the Relevant Period, directly causing losses incurred by Plaintiffs.

32. Based on the alleged facts herein, Defendant(s) acted with scienter. The repeating patterns of price changes to the detriment of Plaintiffs demonstrate that Defendant(s) knowingly or with severe recklessness engaged in unlawful conduct that was intended to and in fact did deceive, manipulate, or defraud the market and its participants, including the Plaintiffs.

## V.   LOSS CAUSATION AND STANDING

33. During the Relevant Period, Defendant(s), or their agents acting on their behalf, engaged in spoofing and other manipulative trading and pricing practices.

34. Defendant(s)' price manipulation caused Plaintiffs to suffer losses compared to what, if any, they would have incurred if the market trading price reflected the true, unmanipulated price for the shares of the relevant ETFs, and as a result, Plaintiffs were directly and proximately harmed by the Defendant(s).

4902-4767-3669, v. 1

## VI.  CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendant(s)

35.  Plaintiffs incorporate by reference the foregoing paragraphs as if more fully set forth herein.

36.  During the Relevant Period, Defendant(s) engaged in and employed devices, schemes, deceptions, illegal acts, practices, and a course of conduct, that were intended to manipulate the market prices of the ETFs traded by the Plaintiffs and which operated as a fraud and deceit upon the Plaintiffs.

37.  Defendant(s)' acts of deception and schemes had a material impact on the market for ETF securities.

38.  Defendant(s) acted with scienter (intent or reckless disregard for the truth) to knowingly engage in transactions designed to deceive investors.

39.  Plaintiffs reasonably relied on the integrity of the market and suffered financial loss as a result of Defendant(s)' intentional acts of deception.

40.  As a direct and proximate result of Defendant(s)' wrongful conduct, Plaintiffs suffered damages in that they bought and sold ETF shares at manipulated prices, in reliance on an assumption of an efficient market free of manipulation. Plaintiffs would not have bought and sold shares at the prices bought and sold if they

4902-4767-3669, v. 1

had been aware of Defendant(s)' manipulative conduct that artificially affected the ETFs' prices.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter Judgment in Plaintiffs' favor and against the Defendant(s) in an amount equal to all trading losses and other damages (including punitive damages if applicable) incurred by Plaintiffs caused by Defendant(s)' wrongful conduct together with interest, attorney fees, and such other relief as may be just and equitable.

## COUNT II

### Violation of Section 9(a)(2) of the Securities Exchange Act of 1934 Against Defendant(s) for Price Manipulation

41. Plaintiffs incorporate by reference the foregoing paragraphs as if more fully set forth herein.

42. Based upon the conduct described above, Defendant(s)' manipulative schemes violated Section 9(a)(2) of the Securities Exchange Act of 1934, which makes it unlawful to engage in a series of manipulative transactions "in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

43. By reason of the conduct described above, Defendant(s) directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to effect, alone or with one or more other persons, a series of

transactions in publicly traded ETF shares that created actual or apparent trading in such securities in order to raise or depress the price of such securities for the purpose of inducing the purchase or sale of such securities by others, including Plaintiffs, and otherwise engaging in the market manipulation strategies such as spoofing to artificially affect the price of securities.

44. Defendant(s)' intentional and/or reckless misbehavior artificially affected the price of the ETF shares that Plaintiffs bought and sold during the Relevant Period. Plaintiffs sustained significant financial injuries directly as a result of Defendant(s)' intentional wrongful conduct and price manipulation.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter Judgment in Plaintiffs' favor and against the Defendant(s) in an amount equal to all trading losses and other damages (including punitive damages if applicable) incurred by Plaintiffs caused by Defendant(s)' wrongful conduct together with interest, attorney fees, and such other relief as may be just and equitable.

## COUNT III

### State Law Fraud

45. Plaintiffs incorporate by reference the foregoing paragraphs as if more fully set forth herein.

46. By engaging in spoofing and other activity that manipulated market prices independent of buyers and sellers in the market, Defendant(s) knowingly or

recklessly injected into the market false and misleading information concerning the fake supply of shares in the ETFs that appeared available for trading. This interfered with the natural market forces of supply and demand and artificially drove the price of the shares downward. When Plaintiffs bought or sold the affected ETFs during the Relevant Period, they suffered damages that were directly and proximately caused by Defendant(s)' fraud in violation of both Michigan and New York common law and state laws.

47. When the Plaintiffs bought and sold shares in the ETFs during the Relevant Period, Plaintiffs were unaware that the market price of the ETFs' shares were being manipulated and therefore, they relied on the efficiency of the market that had been unlawfully manipulated and suffered damages that were directly and proximately caused by the Defendant(s)' fraud. As a result, Plaintiffs suffered damages that were directly and proximately caused by the Defendant(s)' wrongful conduct.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter Judgment in Plaintiffs' favor and against the Defendant(s) in an amount equal to all trading losses and other damages (including punitive damages if applicable) incurred by Plaintiffs caused by Defendant(s)' wrongful conduct together with interest, attorney fees, and such other relief as may be just and equitable.

## VII.     DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

>Respectfully submitted,
>
>HOWARD & HOWARD ATTORNEYS PLLC
>
>By:  */s/ Michael J. Sheehan*
>      Mary C. Dirkes (P42723)
>      Michael J. Sheehan (P58585)
>      Attorneys for Plaintiffs
>      450 West Fourth Street
>      Royal Oak, MI  48067-2557
>      (248) 645-1483/Fax (248) 645-1568
>      mdirkes@howardandhoward.com
>      msheehan@howardandhoward.com

Dated:  May 27, 2025

4902-4767-3669, v. 1